IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BENORD ANGELO BURRELL,           *
      Plaintiff,
                                                      *
   v.                                                    CIVIL ACTION NO. PJM-09-1038
                                                      *
WARDEN RODERICK R. SOWERS, et al.,
      Defendants.                  *
                                                  ******

## **MEMORANDUM OPINION**

On April 23, 2009, the Court received Plaintiff Benord Angelo Burrell's civil rights complaint seeking punitive damages and injunctive relief filed pursuant to 42 U.S.C. 1983. Burrell alleges that his transfer to the North Branch Correctional Institution ("NBCI"), his placement on the Special Management Unit ("SMU") subject to the "Quality of Life Program" ("QLP") and his later placement on administrative segregation due to his refusal to participate in the QLP violated his right to due process, equal protection, and freedom from cruel and unusual punishment. *Id.*

Defendants have filed a Motion to Dismiss, or in the Alternative for Summary Judgment. Paper No. 19. Plaintiff has responded to Defendant's dispositive motion. Paper Nos. 23 and 25. No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2009). For the reasons stated below, the dispositive motion filed by Defendants, treated as a motion for summary judgment, will be denied without prejudice.

**Background**

Plaintiff alleges that on December 31, 2007, he was removed from Roxbury Correctional Institution (RCI) general population and placed on administrative segregation. He claims he was served with a notice, but was not given an opportunity to be heard. Paper No. 1. Shortly

thereafter, on January 17, 2007, Plaintiff was transferred to the Special Management Unit ("SMU") of the North Branch Correctional Institution ("NBCI") without notice and without a chance to contest the allegations used to place him on SMU.

He claims that as of the filing date of his complaint, he has not been given a written factual basis for his placement on SMU, instead receiving vague explanations that his placement occurred because he is a threat to institutional security. *Id*. Added to these initial due process claims[1] is Plaintiff's assertion that the conditions of SMU are atypical and his assignment is tantamount to indefinite placement on isolated confinement combined with the confiscation of property and the revocation of all privileges, except one-hour of "fresh air" per week and twice-a-week showers. *Id* Plaintiff also complains that while on SMU he is subject to a behavioral management program called the Quality of Life Program ("QLP") which allows for inmates to achieve one of six "levels," subject to the "whims and mercy" of SMU officers and levels committee. *Id*. He claims that he has remained on the intake the level since his arrival at NBCI until participation in the QLP was deemed "voluntary" and he was transferred to administrative segregation, where the conditions remain as harsh as those imposed at the intake level. *Id.*

Plaintiff also complains that Division of Correction directives ("DCD")[2] permit his placement in such conditions for being "directly involved or associated with violent behavior." He complains that these directives are overly broad and have no criteria, process, or description defining who will fall into the category. *Id*. Plaintiff further alleges that the directives were adopted in violation of the Maryland Administrative Procedure Act ("APA"), which requires that regulations subject to amendment or modification be subject to public notice and comment. *Id*.

---

[1] In effect, Plaintiff claims his due process rights were violated because no hearing was provided to him before he was assigned to administrative segregation or the SMU. Paper No. 1.

[2] Plaintiff references DCD 100-165 and Division of Correction Institution Bulletin ("DCIB") 13-0.

2

Plaintiff further raises Fourteenth and Eighth Amendment violations, claiming that he is being treated differently than other inmates classified to administrative segregation and that the conditions of his SMU cell assignment subject him to cruel and unusual punishment.[3] In addition, he claims his forced participation in the QLP violates his First Amendment rights. He states that if he does not want to participate in the psychological treatment, he will remain in solitary confinement without regard to his adjustment history. *Id*. Plaintiff claims that DOC directives and standards grant him the right to refuse the QLP.

Plaintiff further asserts that he was denied adequate medical care in that his prescription glasses and asthma medication were denied him upon his transfer to NBCI. He further claims that the air quality on the SMU was unhygienic, causing him harm. *Id*.

Defendants assert that Plaintiff is a verified member of the Black Gorilla Family ("BGF") prison gang, and is responsible for leading two prison disturbances.[4] Paper No. 19. On December 30, 2007, RCI experienced three fights occurring simultaneously. In each of the three fight BGF members assaulted "Bloods." Paper No. 19, Ex. 1. The following day Plaintiff was assigned to administrative segregation at RCI pending investigation into his role in the fights. Plaintiff received written notice of placement on administrative segregation. *Id*. On January 3, 3, 2008, a SMU screening form was completed recommending Plaintiff be reassigned to the NBCI SMU because he "has been found to be a high ranking member of the BGF from several intercepted letters…Through several confidential informants Inmate Burrell was named in

---

[3] Plaintiff claims he is only allowed one hour of outdoor recreation in a "cage" during which he must remain in four-piece restraints (leg irons, handcuffs, security box, and waist chain), preventing him from all but limited mobility. Paper No. 1. Plaintiff also claims that the recreation provided violates DOC directives, which provide he be given out-of-cell exercise one hour per day. *Id*. He states he is not permitted to speak with other inmates and cannot adequately access legal materials. *Id*.

[4] Defendants provide no documentation supporting their claim regarding Plaintiff's affiliation or leadership role with the BGF.

3

assisting with the organization of the December 30, 2007 disturbance…" *Id*., Ex. 2. Plaintiff was transferred to NBCI's SMU QLP on January 18, 2008, *Id*., Ex. 3.

Defendants provide an abundance of documentation regarding the implementation of and revisions to the QLP program at NBCI, which was first implemented in January of 2007, and underwent several changes prior to official start on May 2, 2007.[5] *Id*., Ex. 5 and 6. The purpose of the program was modified in July of 2007 in response to a number of gang-related incidents of violence in correctional facilities. The criteria for placement in the program is that the individual has (i) exhibited behavior that threatens the security of the institution or (ii) has influenced others to engage in conduct that is a threat to security. The behavior that forms the basis for placement in the program must be documented. *Id*.

Defendants state that during this time period several inmates deemed to be the most serious risk were transferred to NBCI and admitted into the QLP. *Id*. Once confined at NBCI, the emergency transfers received a case-by-case review and inmates with little to no documentation to support the allegation of their threat to the security of the institution were transferred out of NBCI. NBCI case manager Cassidy developed the SMU admission form to examine the documentation and evaluate each placement to ensure that the assignments were appropriate. *Id*.

On January 31, 2008, plaintiff underwent his first QLP Behavior Management Plan ("BMP") evaluation. *Id*., Ex. 7. The QLP committee agreed to keep him at the intake (ground) level due to his refusal to participate in the program.[6] *Id*. In April of 2008, however, the QLP

---

[5] According to defendants, the SMU mission is to provide safety and security to the staff and inmates throughout the DOC by "accepting appropriate referrals from other institutions of persons deemed to be a security threat to the good order of that facility." *Id*. The QLP is a behavior modification program permitting decreasing levels of restrictions based upon the participant's behavior. *Id*.

[6] Defendants insist that participants were never "forced" to participate in the program. They

4

was made voluntary, with persons opting not to participate in the program being removed from the intake level of the program and placed on administrative segregation. *Id*. In May, 2008, Plaintiff was classified as an administrative segregation inmate. He remained on administrative segregation until his return to general population in June of 2009.

Defendants claim that the Case Management Manual mandates that an inmate on the QLP intake level receives at least one shower per week. Defendants have failed to provide Plaintiff's record of segregation confinement which would reveal the number of showers he received during that time. Defendants further state that while on NBCI SMU and administrative segregation, Plaintiff has received adequate recreation. Again, however, no records have been provided demonstrating the amount of recreation provided to Plaintiff.

In his opposition, Plaintiff focuses on his claim that confinement on the SMU at NBCI constitutes an atypical and significant hardship giving rise to a liberty interest. Paper No. 23. He states that he should have been accorded a due process hearing and notification of the factual basis for the charges against him. *Id*. Plaintiff complains that his stay in SMU was for an "indefinite" period of time, limited only by Defendants' discretion and completion of a BMP.[7] He maintains that the SMU confinement constitute a typical and significant hardship under the cases of *Wilkerson v. Austin*, 545 U.S. 209 (2005) and *Farmer v. Kavanaugh*, 494 F.Supp.2d 345 (D. Md. 2007) because of the indefinite duration, extreme isolation and restrictions on the SMU,

---

acknowledge, however, that up until March or April of 2008, an inmate's refusal to participate meant that he remained at the intake level of the program until he elected to participate. *Id*., Ex. 5. After the program became "voluntary," refusal to participate meant that the inmate would be assigned to indefinite administrative segregation. *Id*. Paper No. 18, Ex. 1.

[7] Plaintiff further argues that his time housed on administrative segregation at NBCI was likewise indefinite and was as severe in terms of restriction of recreation and property as the terms imposed on those housed on the SMU. Paper No. 23.

and his inability to hold a job which would prevent him from being considered for parole.[8] He claims that he is entitled to process that provides him fair notice of the factual reasons for his assignment, an opportunity to respond, and an administrative decision which provides him a short statement of the reasons for the decision. *Id*. at pps. 17-19. Plaintiff argues that defendants have failed to come forward with evidence justifying his placement on NBCI SMU or on administrative segregation.

**Standard of Review**

Fed. R. Civ. P. 56(c) provides that summary judgment:

> should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.,* 477 U. S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to...the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat,* 346 F.3d at 526 (quoting

---

[8] Plaintiff is serving a life term of incarceration. Paper No. 19, Ex. 1.

*Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

Generally, prisoners do not have a constitutional right to demand to be housed in one prison verses another. "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum v. Fano*, 427 U.S. 215, 224 (1976). Under the Supreme Court's pronouncement in *Sandin v. Conner*, 515 U.S. 472 (1995), the focus on mandatory language in prison regulations was rejected. A liberty interest may be created when state action imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" without regard to mandatory language in prison regulations. *Id.* at 484. Thus, the due process inquiry must focus on the nature of the deprivation alleged and not on the language of particular prison regulations. *Id*. Following the reasoning of the Supreme Court in *Sandin*, the Fourth Circuit held that a liberty interest is not implicated when inmates are placed on administrative segregation, because upon comparison with those conditions they would expect to experience as an ordinary incident of prison life, it does not constitute an atypical and significant hardship. *See Beverati v. Smith*, 120 F.3d 500, 502-04 (4th Cir. 1997); *Reffitt v. Nixon*, 917 F. Supp. 409, 413 (E.D. Va. 1996). The analysis requires the court to conduct a fact specific examination of the case to determine if the conditions Plaintiff maintains give rise to a liberty interest.

There is no argument that the conditions of NBCI SMU, imposed at the intake level, are extremely restrictive and isolated. Intake level inmates are housed single-celled, are allowed no out-of-cell recreation, or if permitted out of their cell receive recreation in a small cage in four point restraints, no visits aside from attorney or clergy, limited property privileges, and no commissary. The only time an intake level inmate may come out of his cell is to take a shower

7

once a week. According to Plaintiff's affidavit, he ate all his meals, cold, in his cell. The physical contact between inmates and between inmates and officers was limited. There is no doubt that the SMU intake level conditions are extremely isolated, controlled, and monitored. The record is disputed as to the conditions of Plaintiff's stay on administrative segregation at NBCI.

It was this type of solitary confinement that was analyzed by the Supreme Court to determine whether a liberty interest was created in the isolated confinement and if so, what due process was to be afforded to the inmate so confined. *See Wilkinson v. Austin*, 545 U.S. 209 (2005). *Wilkinson* recognized that the deprivations of solitary confinement exit in most solitary confinement facilities and looked at the presence of the added factors to find "an atypical and significant hardship" on inmates such that they had a liberty interest in avoiding it. *Id*., at 224. These factors were (1) the potentially indefinite length of detention, limited only by the length of the underlying sentence, and (2) being rendered ineligible for parole due to confinement. *Id*. The Supreme Court found that "while any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context," triggering a protected liberty interest in avoiding placement on such confinement. *Id*. In reviewing *Wilkinson*, it would appear that the Court instructed lower courts to consider the totality of circumstances in a given facility. *Id*.

*Wilkinson* holds that in order to measure whether an inmates' new custodial situation imposes "an atypical and significant hardship within the correctional context" it must be measured against a "baseline." *Id*. at 223-24. While *Wilkinson* did not establish what this "baseline" should be, the Fourth Circuit uses the conditions "imposed on the general population"

as the baseline for its analysis. *Beverati*, 120 F.3d at 504. Here, Plaintiff was moved from general population to administrative segregation, and then to SMU intake level housing.

Plaintiff must confront Defendants' summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial. This he has done. There are genuine disputes of material fact concerning the basis for Plaintiff's assignment to SMU as well as the conditions of his confinement while housed on both the SMU and NBCI administrative segregation as compared to conditions imposed on general population inmates.

The only document Defendants have provided the Court regarding this assignment is the SMU assignment sheet which concludes that Plaintiff was involved in fomenting violence within the institution. Defendants have not advised whether Plaintiff was ever charged or convicted of these offenses, nor have Defendants provide any of the documents supporting the conclusory determination that Plaintiff is a threat to the institution. Moreover, Plaintiff was returned to general population in June of 2009 and Defendants have offered no explanation as to why Plaintiff is no longer a threat to institutional security, nor have they addressed whether Plaintiff was ever advised of the rationale for his transfer to the SMU, other than his being labeled a threat to institutional security.[9]

The record further remains disputed as to the conditions of confinement on the intake level of SMU and administrative segregation versus general population. Plaintiff was reclassified to administration segregation in May of 2008, where he remained for over one year. It is unclear from the record before the Court what, if any, type of restrictions were placed on

---

[9] In renewing their dispositive motion, Defendant's are directed to provide copies of all investigative files relied upon for Plaintiff's transfer and assignment to NBCI administrative segregation or the Behavior Management Program. Such documents may be filed under seal.

Defendants shall also provide a summary of the current policy in effect regarding indefinite assignments to administrative segregation and the BMP.

Plaintiff due to this classification and what, if any, type of reviews were provide him over this one year period.

Additionally, the record remains disputed as to the type of recreation and shower opportunities provided to Plaintiff during his time housed on the SMU and administrative segregation. The Court has not been provided with the daily logs concerning Plaintiff's activities while he was so housed. Plaintiff maintains that he was in pain and suffered adverse health consequences due to his prolonged assignment to the SMU and administrative segregation.

Accordingly, summary judgment cannot be granted at this time. All pending motions shall be denied without prejudice. Defendants may renew the dispositive motion with the appropriate documents attached. A separate Order follows.

July 1, 2010

/s/
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE