IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


BENORD ANGELO BURRELL, #156-633    *
                    Plaintiff
            v.                     *    CIVIL ACTION NO. PJM-09-1038

WARDEN RODERICK R. SOWERS          *
SECRETARY GARY D. MAYNARD
COMMISSIONER OF CORRECTIONS        *
    J. MICHAEL STOUFFER
FORMER WARDEN RODERICK R           *
    SOWERS
ASSISTANT WARDEN KEITH LYONS       *
FORMER WARDEN JOHN A. ROWLEY
ASSISTANT WARDEN RICHARD GRAHAM*
LT. DAMON THOMAS
PSYCHOLOGIST DR. JAMES K.          *
    HOLWAGER
COUNSELOR BRUCE LILLER             *
CASE MANAGEMENT SPECIALIST
    BRYAN HOFFMAN                  *
SGT. THOMAS SIRES.
LT. RONALD DICKENS                 *
CAPTAIN GERALD AMBROSE
CASE MANAGEMENT MANAGER ROBERT  *
MILLER
                    Defendants     *
                                  ***


MEMORANDUM OPINION

Pending are Defendants' Supplemental Motion to Dismiss or for Summary Judgment and

Plaintiff's self-represented opposition. ECF Nos. 40 & 43.  The case is ripe for dispositive review.[1]

Upon review of papers and exhibits filed, the Court finds an oral hearing in this matter unnecessary.

*See* Local Rule 105.6 (D. Md. 2011).

_____

[1]      Defendants' original Motion to Dismiss or for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment were denied without prejudice on July 1, 2010, pending submission of additional documents.   ECF No. 27.  The Court has considered all responsive pleadings in issuing this opinion.

**Background**

As previously recounted by the Court, Plaintiff alleges that on December 31, 2007, he was removed from Roxbury Correctional Institution (RCI) general population and placed on administrative segregation.  He claims he was served with a notice, but was not given an opportunity to be heard.  ECF No. 1.  On January 17, 2007, Plaintiff was transferred to the Special Management Unit ("SMU") of the North Branch Correctional Institution ("NBCI") without notice and without a chance to contest the allegations used to place him on SMU.

He claims that as of the filing date of his complaint he had not been given a written factual basis for his placement on SMU, instead receiving vague explanations that his placement occurred because he is a threat to institutional security. *Id*.  Added to these initial due process claims[2] is Plaintiff's assertion that the conditions of SMU are atypical and his assignment is tantamount to indefinite placement on isolated confinement combined with the confiscation of property and the revocation of all privileges, except one-hour of "fresh air" per week and twice-a-week showers.  *Id.*  Plaintiff also complains that while on SMU he is subject to a behavioral management program called the Quality of Life Program ("QLP") which allows for inmates to achieve one of six "levels," subject to the "whims and mercy" of SMU officers and levels committee. *Id*.  He claims that he has remained on the intake level since his arrival at NBCI until participation in the QLP was deemed "voluntary" and he was transferred to administrative segregation, where the conditions remain as harsh as those imposed at the intake level.  *Id.*

Plaintiff also complains that Division of Correction directives ("DCD")[3] permit his placement in such conditions for being "directly involved or associated with violent behavior."  He complains

---

[2]       In effect, Plaintiff claims his due process rights were violated because no hearing was provided to him before he was assigned to administrative segregation or the SMU. ECF No. 1.

[3]       Plaintiff references DCD 100-165 and Division of Correction Institution Bulletin ("DCIB") 13-0.

that these directives are overly broad and have no criteria, process, or description defining who will fall into the category.  *Id.*   Plaintiff further alleges that the directives were adopted in violation of the Maryland Administrative Procedure Act ("APA"), which requires that regulations subject to amendment or modification be subject to public notice and comment.  *Id.*

Plaintiff further raises Fourteenth and Eighth Amendment violations, claiming that he is being treated differently than other inmates classified to administrative segregation and that the conditions of his SMU cell assignment subject him to cruel and unusual punishment.[4]  In addition, he claims his forced participation in the QLP violates his First Amendment rights.  He states that if he does not want to participate in the psychological treatment, he will remain in solitary confinement without regard to his adjustment history.  *Id.*   Plaintiff claims that DOC directives and standards grant him the right to refuse the QLP.

Plaintiff further asserts that he was denied adequate medical care in that his prescription glasses and asthma medication were denied him upon his transfer to NBCI.  He further claims that the air quality on SMU is unhygienic, causing him harm. *Id.*

 Defendants assert that Plaintiff is a verified member of the Black Guerilla Family ("BGF") prison gang, and is responsible for leading two prison disturbances.[5]  ECF Nos. 19 & 40.  The most recent disturbance occurred on December 30, 2007, when RCI experienced three fights occurring simultaneously.  In each of the three fights BGF members assaulted "Bloods."  ECF No. 19, Ex. 1, ECF No. 40.  The following day Plaintiff was assigned to administrative segregation at RCI pending

---

[4]     Plaintiff claims he is only allowed one hour of outdoor recreation in a "cage" during which  he must remain in four-piece restraints (leg irons, handcuffs, security box, and waist chain), preventing him from all but limited mobility.  ECF No. 1.  Plaintiff also claims that the recreation  violates DOC directives, which provide he be given out-of-cell exercise one hour per day.  *Id.*  He states he is not permitted to speak with other inmates and cannot adequately access legal materials. *Id.*

[5]     Defendants provided no documentation supporting their claim regarding Plaintiff's affiliation or leadership role with the BGF.  Thus, their Motion for Summary Judgment was denied without prejudice.  Defendants

investigation into his role in the fights.   Plaintiff received written notice of placement on administrative segregation. *Id*.   On January 3, 2008, a SMU screening form was completed recommending Plaintiff be reassigned to the NBCI SMU because he "has been found to be a high ranking member of the BGF from several intercepted letters…Through several confidential informants Inmate Burrell was named in assisting with the organization of the December 30, 2007 disturbance…" *Id*., Ex. 2.  Plaintiff was transferred to NBCI's SMU QLP on January 18, 2008.  *Id*., Ex. 3.

Prior to his transfer from RCI, Plaintiff's property was inventoried.  ECF No. 19, Ex. 8.  On January 28, 2008, Plaintiff filed an ARP indicating his eyeglasses were taken during his intake at NBCI.  He also claimed his asthma medication had been taken.  *Id*., Ex. 9. Plaintiff withdrew the ARP on February 6, 2008, indicating he had received half of his medication on February 2, 2008, and all of his medication on February 6, 2008.  *Id*., ECF No. 1.  On February 22, 2008, Tiffany Bennett, RN sent a memorandum to Lt. Dolly who was investigating Plaintiff's ARP advising that Plaintiff was seen by Dr. Djhanmir on January 28, 2008, his blood pressure and pulse were within normal limits, his medications were reordered, and he was referred to the optometrist.  *Id*.  It was further noted that Plaintiff's eyeglasses should have been with his personal property but nonetheless he had been scheduled to see the optometrist.  *Id*.  He received new eyeglasses on April 29, 2008. *Id*., Ex. 10.

Defendants provide an abundance of documentation regarding the implementation of and revisions to the QLP program at NBCI, which was first implemented in January of 2007, and underwent several changes prior to official start on May 2, 2007.[6]  *Id*., Ex. 5 and 6.  The purpose of

---

have now cured this deficiency.  ECF No. 40, Ex. 21; *.see also* ECF No. 19.

[6]        According to defendants, the SMU mission is to provide safety and security to the staff and inmates throughout the DOC by "accepting appropriate referrals from other institutions of persons deemed to be a security threat

the program was modified in July of 2007 in response to a number of gang-related incidents of violence in correctional facilities.  The criteria for placement in the program are that the individual has (i) exhibited behavior that threatens the security of the institution or (ii) has influenced others to engage in conduct that is a threat to security.  The behavior that forms the basis for placement in the program must be documented.  *Id.*

Defendants state that during this time period several inmates deemed to be the most serious risk were transferred to NBCI and admitted into the QLP.  *Id.*  Once confined at NBCI, the emergency transfers received a case-by-case review and inmates with little to no documentation to support the allegation of their threat to the security of the institution were transferred out of NBCI.  NBCI case manager Cassidy developed the SMU admission form to examine the documentation and evaluate each placement to ensure that the assignments were appropriate.  *Id.*

On January 31, 2008, Plaintiff underwent his first QLP Behavior Management Plan ("BMP") evaluation.  *Id.*, Ex. 7.  The QLP committee agreed to keep him at the intake (ground) level due to his refusal to participate in the program.[7]  *Id.*  Plaintiff received monthly reviews where it was recommended he remain at the intake level due to his continued refusal to participate in the program.  *Id.*  In April of 2008, however, the QLP was made voluntary, with persons opting not to participate in the program being removed from the intake level of the program and placed on administrative segregation.  *Id.*  In May of 2008, Plaintiff was classified as an administrative segregation inmate.  He remained on administrative segregation until his return to general population in June of 2009.  *Id.*

_____

to the good order of that facility."  *Id.*  The QLP is a behavior modification program permitting decreasing levels of restrictions based upon the participant's behavior.  *Id.*

[7]      Defendants insist that participants were never "forced" to participate in the program.  They acknowledge, however, that up until March or April of 2008, an inmate's refusal to participate meant that he remained at the intake level of the program until he elected to participate.  *Id.*, Ex. 5.  After the program became "voluntary," refusal to participate meant that the inmate would be assigned to indefinite administrative segregation.  *Id.*.

Defendants maintain that the Case Management Manual mandates that an inmate on the QLP intake level receives at least one shower per week. Defendants have provided Plaintiff's records of segregation confinement which indicate that Plaintiff received regular showers and was offered the allowable amount of out of cell recreation, although at times he declined same. ECF No. 40, Ex. 22,

In his first opposition, Plaintiff focuses on his claim that confinement on the SMU at NBCI constituted an atypical and significant hardship giving rise to a liberty interest. ECF No. 23. He states that he should have been accorded a due process hearing and notification of the factual basis for the charges against him. *Id.* Plaintiff complains that his stay in SMU was for an "indefinite" period of time, limited only by Defendants' discretion and completion of a BMP.[8] He maintains that the SMU confinement constitute atypical and significant hardship under the cases of *Wilkerson v. Austin*, 545 U.S. 209 (2005) and *Farmer v. Kavanaugh*, 494 F.Supp.2d 345 (D. Md. 2007) because of the indefinite duration, extreme isolation and restrictions on the SMU, and his inability to hold a job which would prevent him from being considered for parole.[9] He claims that he is entitled to process that provides him fair notice of the factual reasons for his assignment, an opportunity to respond, and an administrative decision which provides him a short statement of the reasons for the decision. *Id.* at pps. 17-19. Plaintiff argues that Defendants have failed to come forward with evidence justifying his placement on NBCI's SMU or on administrative segregation. He claims, for the first time in his supplemental opposition, that he was targeted for being a member of the Nation of Islam and that the pseudonym he uses, "Shabazz," is not evidence of his membership in the BGF but rather is used by him due to his membership in the Nation of Islam. ECF No. 43. Nothing

---

[8]     Plaintiff further argues that his time housed on administrative segregation at NBCI was likewise indefinite and was as severe in terms of restriction of recreation and property as the terms imposed on those housed on the SMU. ECF No. 23.

[9]     Plaintiff is serving a life term of incarceration. ECF  No. 19, Ex. 1.

Plaintiff argues regarding his gang affiliation, or lack thereof, calls into question Defendants' sincere belief that Plaintiff is a high ranking member of the BGF.

### Standard of Review

Under Fed. R. Civ. P. 56(a):

A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law.   In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."   A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact.  No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to

confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in a light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Federal Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson*, 477 U.S. at 252.

This Court has previously held that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D. Md. 2001) (citation omitted). Indeed, the court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)).

### Analysis

#### Mootness

Defendants assert that Plaintiff's complaint for injunctive relief is now moot because he was released to general population on June 9, 2009. ECF No. 19, Ex. 13.

" '[A] case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *United States v. Hardy*, 545 F.3d 280, 283 (4th Cir. 2008) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). " 'The inability of the federal judiciary to review moot cases derives from the requirement of Art. III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy.'" *Id.* (quoting *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974)).

Under 42 U.S.C. § 1983, an actual controversy must exist at all times while the case is pending.  *See Steffel v. Thompson*, 415 U. S. 452, 459 n.10 (1974).  It is possible for events subsequent to the filing of the complaint to make an injunctive relief request moot.  *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).  This is so even though such a case presented a justiciable controversy at an earlier point in time and an intervening event rendered the controversy moot.  *See Calderon v. Moore*, 518 U.S. 149, 150 (1996).  Indeed, "[w]here on the face of the record it appears that the only concrete interest in the controversy has terminated, reasonable caution is needed to be sure that mooted litigation is not pressed forward, and unnecessary juridical pronouncements on even constitutional issues obtained…"  *See Lewis v. Continental Bank* Corp,   494 U.S. 472, 480 (1990).   To the extent that Plaintiff is seeking injunctive relief; the claim was mooted when he was released to general population.  His claim for damages for the past wrongs alleged, however, is not moot, and will be analyzed below.

### Due Process Claims

Administrative Segregation Assignment

In the prison context a liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U. S. 472, 484 (1995).  Following the reasoning of the Supreme Court in *Sandin*, the Court finds no liberty violation implicated in the decisions associated with Plaintiff's initial placement on administrative segregation at RCI, as it is not atypical for inmates to be placed on administrative segregation for any number of reasons.   *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983); *Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997).   Plaintiff was transferred to NBCI and remained on segregation.  The Court finds nothing in the record which shows that the nature of

Plaintiff's assignments to administrative segregation at RCI and NBCI comprised the atypical hardships contemplated by *Sandin* or *Beverati*. Therefore, they do not implicate a liberty interest. Further, Plaintiff's transfer to NBCI does not in and of itself implicate a liberty interest; he has no entitlement to notice and an opportunity to be heard prior to his transfer because as a prisoner he has no liberty interest in being housed in any particular prison facility. *See Olim v. Wakinekona*, 461 U.S. 238, 244-45 (1983); *Meachum v. Fano*, 427 U.S. 215, 224-25 (1976).

SMU Assignment

The restrictions which are the subject of Plaintiff's Complaint were imposed on January 18, 2008, when Plaintiff was assigned to the SMU at NBCI. This Court must determine if the conditions under which he was confined while in the SMU constituted an atypical and significant hardship.

There is no argument that the conditions at NBCI SMU at the intake level are extremely restrictive, controlled, monitored, and isolated. According to the record, Plaintiff remained so confined for approximately 110 days, from January 18, 2008 to May 8, 2008. Intake level inmates are housed alone, have no visits aside from attorneys or clergy, receive limited property privileges, and receive no commissary. The only time an intake level inmate may come out of his cell is to take a shower or to recreate once or twice a week. The physical contact between inmates and between inmates and officers is severely limited.

The Supreme Court examined the due process issue involving inmates confined at the Ohio State Penitentiary ("OSP"), a super-maximum security prison where almost all human contact was prohibited and communication between cells was forbidden, to determine whether a liberty interest was created in the isolated confinement and if so, what due process was to be afforded to the inmate so confined. *See Wilkinson v. Austin*, 545 U.S. 209 (2005). At the OSP, exercise was limited to one

10

hour a day in a small indoor room and the inmates were exposed to light 24 hours per day.

*Wilkinson* recognized that the deprivations detailed in that case exist in most solitary confinement

facilities and looked at the presence of added factors to find "an atypical and significant hardship" on

inmates such that they had a liberty interest in avoiding it.[10]  *Id*. at 224.   These factors were (1) the

potentially indefinite length of detention, limited only by the length of the underlying sentence, and

(2) being rendered ineligible for parole due to confinement.   *Id*.   The Supreme Court found that

"while any of these conditions standing alone might not be sufficient to create a liberty interest;

taken together they impose an atypical and significant hardship within the correctional context,"

triggering a protected liberty interest in avoiding placement on such confinement.  *Id*.  In reviewing

*Wilkinson*, it would appear that the Court instructed lower courts to consider the totality of

circumstances in a given facility.   *Id*.

Applying the Supreme Court's rationale in *Wilkinson*, this Court found that a transfer to the

Maryland Correctional Adjustment Center ("MCAC"), a super-maximum security facility,

implicated procedural due process protections, and concluded that:

> In light of the prohibition of "almost all human contact," coupled with severe
> restrictions on movement or any type of activity, both of which may last for the
> duration of some inmates' underlying sentences, and may be less likely to be relieved
> by parole than the less arduous conditions at other facilities, the conditions at MCAC
> create such a hardship when judged against "any plausible baseline." Inmates thus
> have a protected liberty interest in avoiding transfer to MCAC.

*Farmer v. Kavanaugh*, 494 F. Supp. 2d 345, 358 (D. Md. 2007).

Plaintiff describes the conditions imposed in the SMU as follows.   All property was

---

[10]      While *Wilkinson* involved transfer to and housing in the isolated confinement of a "supermax" facility, it involved similar solitary confinement issues found here-- isolated human contact for potentially "indefinite" periods.  Therefore, the Court finds *Wilkinson* instructive for due process analysis purposes.

confiscated and privileges were revoked, with the exception of one weekly hour of recreation in fresh air while wearing full restraints.   Two weekly showers were to be provided but could be revoked for minor offenses, such as talking or writing "kites" to other inmates, or covering cell lighting, which is on constantly.   ECF Nos. 1 & 23.  These restrictive conditions of intake level, together with the initial mandatory nature of the program, approach the type of conditions this Court has found to invoke a protected liberty interest.

At the time Plaintiff was assigned to the SMU, inmates were informed that they must participate in the BMP in order to earn their way out of the SMU and if they opted out of the program they remained at the most restrictive intake level until they chose to participate.  Plaintiff states that confinement in the SMU was of an indefinite duration.  The indefinite duration of the confinement was created by the mandatory nature of program participation.[11]  When the "mandatory" requirement was removed, inmates who chose not to participate in the BMP were assigned to administrative segregation and told they would remain so assigned until the Assistant Commissioner was convinced they were no longer a threat to the security of the institution.  Inmates were told however, that the only way they could convince the assistant commissioner was to participate in the BMP.  Even when participation in the BMP was deemed "voluntary," it was clear that participation was required if an inmate had any desire to return to general population.  Thus, the

---

[11]       The difference between this case and *Farmer* is that the length of Plaintiff's stay on various SMU levels was in his own hands. The ability to move forward and to earn more privileges is based on the behavior of the inmate participants and does not rely solely on the discretion of a single decision-maker.  In addition, the SMU policy requires regular reviews of the inmate participant's status.  The record evidence shows that reviews were conducted in Plaintiff's case, albeit in a cursory manner due to his refusal to participate in the BMP.

assignment to administrative segregation for non-participants was indefinite.

At no point in his complaint does Plaintiff claim that his housing on SMU and his lack of participation in programming and institutional job assignments adversely affected his eligibility for parole. Any such claim lacks evidentiary support. First, unlike the *Wilkinson* inmates, Plaintiff's assignment to the SMU did not render him ineligible for parole for the duration of his stay. Second, Plaintiff's violent offense and life term of imprisonment are factors weighing against his suitability for parole. Thus, the undersigned does not find any assertion regarding parole eligibility persuasive; however, the indefinite duration of the restrictive conditions does give rise to a liberty interest entitling Plaintiff to due process protections arising at the time of assignment to the SMU.

The *Wilkinson* Court found that the process provided to Ohio inmates assigned to OSP complied with due process protections, noting that the Ohio inmates received written notice 48 hours in advance of a hearing "summarizing the conduct or offense triggering the review" and were provided a prepared form explaining why the review was initiated. *Wilkinson*, 545 U.S. at 216. The Ohio inmates were permitted to attend the hearing where they were allowed to offer "pertinent information, explanation and/or objections to OSP placement and may submit a written statement," but could not call witnesses. *Id.* In addition to the notice and hearing, the Ohio system included a review of the committee's decision by the warden, who was to provide reasons for an approval of an assignment, as well as an additional review by a Bureau which was vested with final decision-making authority over all inmate assignments in Ohio. *Id.* After these reviews were completed, the inmate was allowed 15 days to file objections with the Bureau and only after this 15-day period

expired was the inmate transferred to the facility.  *Id.* at 217.  Inmates who were transferred were

given another review within 30 days of their arrival and, thereafter, were reviewed yearly.  *Id.*

> The three factors to be balanced to determine how much process is due are:

> > First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Wilkinson*, 545 U.S. at 224-225, *citing Matthews v. Eldridge*, 424 U.S. 319, 335 (1976).

Defendants were directed to file under seal all documentation concerning any investigation

into Plaintiff's alleged threatening activity.  Plaintiff has been provided the materials in redacted

form.  It is clear that correctional employees received information that Plaintiff is a high ranking

member of the BGF who was involved in a disturbance at RCI in November of 2006 for which he

was sanctioned.  It was also believed that he assisted in organizing a mass disturbance in December,

2007 at RCI, a disturbance which affected three housing units.  His gang activity, involvement in

disturbances, and life sentence all led correctional staff to recommend his transfer to NBCI SMU.

That Plaintiff now denies gang affiliation is of no moment.  Defendants are in possession of

sufficient information to substantiate their findings that Plaintiff remains a high ranking gang

member capable of inciting other inmates and thus a threat to security.  ECF Nos. 19 & 40.

As a prisoner, Plaintiff is not entitled to the process due to persons who remain at liberty.

"Prisoners held in lawful confinement have their liberty curtailed by definition, so the procedural

protections to which they are entitled are more limited than in cases where the right at stake is the

right to be free from confinement at all." *Wilkinson*, 545 U.S. at 225.  He is not entitled to an adversarial hearing, witnesses, evidence introduction, or other trappings of a full trial.

Plaintiff acknowledges that he was told he was being assigned to administrative segregation because he was believed to be a threat to the security of the institution.  The exigencies present explain why notice was not provided before Plaintiff was assigned to administrative segregation. Expertise of prison officials in matters of security must be given its due deference.  *See Sandin v. Conner*, 515 U.S. 472, 482 (1995).  Plaintiff's assignment was supported by documentation of his involvement in activities threatening to the security of the institution. *See* ECF Nos. 19 & 40.

While the process provided to inmates at NBCI did not provide for as many levels of administrative review as provided to the inmates in *Wilkinson*, the reviews occurred monthly rather than annually.  The undersigned finds that the process afforded to Plaintiff met with minimal constitutional standards.

**Equal Protection Claims**

"The Equal Protection Clause generally requires the government to treat similarly situated people alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  To show that his equal protection rights were violated Plaintiff must demonstrate that he was treated differently than similarly situated inmates and the discrimination was intentional or purposeful.  *See Williams v. Bitner*, 307 Fed. Appx. 609, 611 (3rd Cir. 2009).  If the discrimination was based on Plaintiff's membership in a suspect class, the differential treatment must be narrowly tailored to a compelling interest; otherwise, Plaintiff must show that the discrimination did not bear a rationale

15

relationship to a legitimate government purpose.   *See Cleburne*, 473 U.S. at 440-42.

Viewing the facts and papers in a light most favorable to Plaintiff, he presents no genuine dispute whether the denial of his privileges violated equal protection.   *See Dennis v. Columbia Colleton Medical Center, Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).   Plaintiff has presented no evidence that his SMU and administrative segregation placements were based on a suspect classification.   Rather, the evidence shows that he was so assigned because of his validated membership in a prison gang and his role in inciting prison disturbances.   The program was designed to "provide safety and security to the staff and inmates throughout the Division of Corrections" and to "reduce risky behavior."  ECF No. 19.   This is a legitimate government purpose. *See Overton v. Bazzetta*, 539 U.S. 126, 133 (2003) ("internal [prison] security [is] perhaps the most legitimate of penological goals").   Curtailment of visitation, recreation, and property privileges, which emphasizes the connection between an inmate's "choices and consequences," is rationally related to providing a safer prison environment.  ECF No. 19; *see Overton*, 539 U.S. at 133.   Defendants are entitled to summary judgment on Plaintiff's equal protection claim.

### Eighth Amendment Claim

#### Conditions

To the extent Plaintiff alleges he was subjected to cruel and unusual punishment as a result of his confinement in the SMU, his claim fails. Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment.   *Rhodes v. Chapman*, 452 U. S. 337, 347 (1981).  However, conditions which are merely restrictive or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society."  *Id*.

In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements - that 'the deprivation of [a] basic

16

> human need was *objectively* sufficiently serious,' and that
> '*subjectively* the officials acted with a sufficiently culpable state of
> mind.'

*Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original; citation omitted).   "These

requirements spring from the text of the amendment itself; absent intentionality, a condition imposed

on an inmate cannot properly be called "punishment," and absent severity, such punishment cannot

be called "cruel and unusual." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) *citing Wilson v.*

*Seiter*, 501 U.S. 294, 298-300 (1991).

To establish a sufficiently culpable state of mind, there must be evidence that a known

excessive risk of harm to the inmate's health or safety was disregarded.  *See Wilson*, 501 U. S. at

298.  In other words, "the test is whether the guards know the plaintiff inmate faces a serious danger

to his safety and they could avert the danger easily yet they fail to do so." *Brown v. North Carolina*

*Dept. of Corrections,* 612 F.3d 720, 723 (4th Cir. 2010), *quoting Case v. Ahitow*, 301 F.3d 605, 607

(7th Cir.2002).  Conduct is not actionable under the Eighth Amendment unless it transgresses bright

lines of clearly-established pre-existing law.  *See Maciariello v. Sumner*, 973 F. 2d 295, 298 (4th Cir.

1992).

The objective prong of a conditions claim requires proof of an injury.  "[T]o withstand

summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce

evidence of a serious or significant physical or emotional injury resulting from the challenged

conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir.1993).  "Only extreme deprivations

are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions

of confinement." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir.2003).  Demonstration of an

extreme deprivation proscribed by the Eighth Amendment requires proof of a serious or significant

physical or emotional injury resulting from the challenged conditions.  *See Odom v. South Carolina Dept. of Corrections*, 349 F. 3d 765, 770 (4th Cir. 2003).

Defendants' actions are not actionable unless "in light of preexisting law the unlawfulness of those action is apparent."  *Iko v. Shreve*, 535 F. 3d 225, 238 (4th Cir. 2008) citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  "We do not require of such officials the legal knowledge culled by the collective hindsight of skilled lawyers and learned judges, but instead only the legal knowledge of an objectively reasonable official in similar circumstances at the time of the challenged conduct."  *Johnson v. Caudill*, 475 F. 3d 645, 650 (4th Cir. 2007).

In the instant case there was no bright line crossed by Defendants in placing Plaintiff on the SMU.  The conditions as described by Plaintiff were not so severe that Defendants could be charged with "fair warning that their conduct was unconstitutional."  *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F. 3d 2929, 313 (4th Cir. 2006).   The discomforts experienced by Plaintiff on the SMU were restrictive and harsh, but did not impose cruel and unusual punishment on him.   This conclusion is supported by the absence of proof of significant, serious physical or psychological injury resulting from plaintiff's temporary stay on the SMU.   Routine discomfort is part of prison life. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996), citing *Hudson v. McMillan*, 503 U.S. 1, 8-9 (1992).   Notwithstanding the isolation Plaintiff suffered in the SMU and his allegations that he had limited fresh air activities and showers (ECF No. 1), there is no evidence that he sustained serious or significant physical or emotional injury as a result of his confinement.[12]

---

[12]      Plaintiff alleges that his lack of recreation caused him painful neck and back spasms and muscle cramps. He further asserts he takes medication for poor circulation which he claims is caused by lack of exercise. He further alleges that the lack of circulation has led to him suffering from constipation for which he also requires medication.  ECF No. 1.  Defendants note that Plaintiff's constipation is due to his lactose intolerance. He was diagnosed as suffering from severe constipations and was treated with lactulose.   ECF

Additionally, the record evidence belies Plaintiff's claim that the air quality was poor. ECF Nos. 19, Ex. 12. On July 10, 2009, Rich Glenn, Maintenance Supervisor sent Casey Campbell, Case Management Manager a memorandum attaching air quality and circulation reports for each of NBCI's housing units due to a large number of complaints from inmates regarding air quality. The report indicated that testing revealed that NBCI met or exceeded federal standards. *Id.* Defendants are therefore entitled to summary judgment on any Eighth Amendment conditions claim.

Medical Claim

Plaintiff indicates he has a history of asthma, hypertension, and depression for which he receives treatment. As noted, supra, he states that he was deprived of his eyeglasses and asthma medication on January 18, 2008, when he was transferred to NBCI. Plaintiff's property inventory

---

No. 19, Ex. 11. There is no evidence in Plaintiff's medical records that he complained of neck, back, or muscle pain. *Id.* There is no indication that the constipation was due to any lack of exercise as alleged by Plaintiff. There is no evidence that Plaintiff's asthma or hypertension worsened during his confinement on segregation. *Id.*

Plaintiff also claims that while on the SMU he had no access to the law library and could "only order cases from Baltimore via satellite service but only if I know the exact citation." ECF Nos. 1, 23 & 43. Whether offered as a ground under the Fourteenth Amendment as a due process or access-to-courts claim, Plaintiff has failed to allege a constitutional violation based upon this limited allegation as he does not allege any injury. "Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.' *O'Dell v. Netherland*, 112 F. 3d 773, 776 (4th Cir. 1997), quoting *Lewis v. Casey*, 518 U. S. 343, 355 (1996).

Plaintiff also appears to claim that he was denied access to the ARP process. The records reflect, however, that Plaintiff's ARP filed on January 26, 2008, was dismissed because the ARP investigation revealed all of Plaintiff's medical issues had been addressed. ECF No. 19, Ex. 9. ). His claim that he was denied access to forms used to file an Administrative Remedy Procedure request (ARP) is a claim that he is denied access to courts. The tools required by *Bounds v. Smith*, 430 U. S. 817, 821 (1977) "are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." *Lewis v. Casey*, 518 U. S. 343, 355 (1996). Impairment of other capacities to litigate are consequential to incarceration and are constitutional. *Id.* Thus, Plaintiff's claim regarding the ARP process is subject to dismissal.

indicates he was in possession of his eyeglasses upon his arrival at NBCI.   ECF No. 19, Ex. 8.   He states that he remained without his eyeglasses and medication for 22 days and as such he could not see and was short of breath.   ECF No. 1.   Plaintiff first submitted a sick call slip and ARP concerning his medical claims on January 26, 2008.   Plaintiff indicates he received one half of his medication on February 2, 2008, and the remainder on February 6, 2008.   Plaintiff states that the SMU provided no pre-transfer screening to prevent mentally ill inmates from being placed on the unit. He further alleges that due to the denial of recreation he suffers from neck and back spasms and muscle cramps, requires medication due to poor circulation, and suffers constipation.   *Id.*

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.   *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."   *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) *citing Wilson v. Seiter*, 501 U.S.294, 297 (1991).   In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need.   *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).   Objectively, the medical condition at issue must be serious.   *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care).   Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839– 40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) quoting *Farmer* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted. *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000); citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

The uncontroverted records reveal that Plaintiff received his medication approximately two weeks after his transfer and his glasses were replaced in a timely fashion. ECF Nos. 1, ECF No. 19, Ex. 10, * ECF No. 40. Record evidence also demonstrates, contrary to Plaintiff's claim, that there is a pre-transfer screening process before inmates are moved to the SMU and Plaintiff was subjected to same prior to his transfer. ECF No. 19, Ex. 2, ECF No. 40, Ex. 15. The evidence indicates Plaintiff was diagnosed as suffering from depression prior to his transfer but refused medication. He began taking Prozac following his transfer to NBCI and responded well to the treatment. *Id*. Medical records and segregation logs establish that while housed on segregation at NBCI Plaintiff was seen regularly by medical staff. There is simply no evidence that he suffered the injuries alleged or that

21

Defendants were in any way directly involved in the denial of medical care.[13]  As such, Plaintiff's

medical claims against them are subject to dismissal.  *See West v. Adkins*, 815, F. 2d 993 (4th Cir.

1987).

### First Amendment Claim

Plaintiff claims that the BMP seeks to "change the way plaintiff thinks and believes through

psychological approaches and solitary conditions."  ECF No. 1.  He alleges that he made officials

aware that he did not wish to participate in the BMP and as a result of his choice he remained in

solitary confinement indefinitely.

The First Amendment protects "the right to refrain from speaking at all."    *Wooley v.

Maynard*, 430 U.S. 705, 714 (1977).  An inmate, however, does not retain those First Amendment

rights that are "inconsistent with his status as a prisoner or with the legitimate penological objectives

of the corrections system."  *Pell v. Procunier*, 417 U.S 817, 822  (1974).  Thus, to show a violation

of his First Amendment rights, an inmate must demonstrate that the restriction "serve[d] no

legitimate penological goal and/or was not reasonably related to rehabilitation."  *Folk v. Attorney

General*, 425 F. Supp.2d 663, 673 (W. D. Pa. 2006).

The BMP was intended to "reduce risky behavior" of inmates "deemed to be a security threat

to the good order of [the institution]," and to facilitate their "ultimate[]…return to a less restrictive

environment."  ECF No. 19.  Inmates were required to "give a verbal commitment to participate in

---

[13]        Plaintiff reported on January 28, 2008, during his chronic care clinic examination that since his last visit his asthma had improved.  ECF No. 19, Ex. 10, p. 9.  On February 15, 2008, he reported suffering from right kidney pain which was ultimately diagnosed as severe constipation and treated with lactulose.  There is no evidence Plaintiff ever complained of muscle pain, cramping or spasms.  ECF No. 19, Exs. 10 & 11, ECF No. 40 Exs. 15 & 22.

the program" and to "demonstrate [r]espectful, appropriate behavior" to progress through the BMP

levels.  *Id*.  Plaintiff was placed in the BMP because he was deemed to be a threat to institutional

security.  *Id*.

Plaintiff raises no genuine issue about the program's penological goal of "reducing risky

behavior" and improving institutional safety or its reasonable relationship to his rehabilitation.  *See*

*Folk*, 425 F.Supp.2d at 673-74 (dismissing inmate's First Amendment claim arising from required

participation in rehabilitative programs).   Defendants are entitled to summary judgment on

Plaintiff's First Amendment claim.

## Property Claim

Plaintiff's claim that his property was improperly confiscated, sent home and/or lost fails.  In

the case of lost or stolen property, sufficient due process is afforded to a prisoner if he has access to

an adequate post-deprivation remedy.  *See Parratt v. Taylor*, 451 U. S. 527, 542-44 (1981),

*overruled on other grounds by Daniels v. Williams*, 474 U. S. 327 (1986).   The right to seek

damages and injunctive relief in Maryland courts constitutes an adequate post deprivation remedy.[14]

*See Juncker v. Tinney*, 549 F. Supp. 574, 579 (D. Md. 1982).[15]   Even if Plaintiff's property was

improperly destroyed, such a claim does not rise to a constitutional violation.

## Programming Claim

Likewise, to the extent Plaintiff clams that his assignment to NBCI or to administrative

---

[14]   Plaintiff may avail himself of remedies under the Maryland's Tort Claims Act and through the Inmate Grievance Office.

[15]   Although *Juncker* dealt with personal injury rather than property loss, its analysis and conclusion that sufficient due process is afforded through post deprivation remedies available in the Maryland courts also applies to cases of lost or stolen property, given *Juncker's* reliance on *Parratt* in dismissing plaintiff's due process claim.

segregation prevented him from being assigned a prison job or being able to access educational or other prison programs, his claim is unavailing.  To show a civil rights violation with respect to a prison job assignment or other programming Plaintiff would have to show that the actions taken against him impacted on the exercise of a constitutionally protected right.  Prisoners, however, do not have a constitutionally protected right to work while incarcerated, or to remain in a particular job once assigned, or to access education or rehabilitative programs. *See Awalt v. Whalen*, 809 F. Supp. 414, 416-17 (E.D. Va. 1992); *Altizer v. Paderick*, 569 F. 2d 812, 815 (4th Cir. 1978);  *Rizzo v. Dawson*, 778 F. 2d 527, 530 ((9th Cir. 1985) ( no right to vocational course of rehabilitation); *see also Rhodes v. Chapman*, 452 U.S. 337, 348 (1981) (limits on work or education due to overcrowding do not constitute punishment); *Bowring v. Goodwin*, 551 F.2d 44, 48, n. 2 (4th Cir. 1977) (rehabilitation is a goal of incarceration but is not constitutionally required).  Removing a prisoner from a job simply does not rise to the level of cruel and unusual punishment prohibited by the Eight Amendment.  *See Williams v. Meese*, 926 F.2d 994, 998 (10th Cir. 1991).

### Violation of Division of Correction Directive Claim

Plaintiff maintains that Defendants failed to follow their written directives regarding out of cell activity.  To the extent that written directive were not followed to the letter, the adoption of procedural guidelines does not give rise to a liberty interest; thus, the failure to follow regulations does not, in and of itself, result in a violation of due process.  *See Culbert v. Young*, 834 F.2d 624, 628 (7th Cir. 1987).[16]

---

[16]    Regardless of any alleged violations of internal regulations, the law is settled that the failure to follow a prison directive or regulation does not give rise to a federal claim, if constitutional minima are met. *See Myers v. Kelvenhagen*, 97 F.3d 91, 94 (5th Cir. 1996).

**Conclusion**

In light of the above analysis, Defendants' Supplemental Motion to Dismiss or for Summary Judgment, construed as a Supplemental Motion for Summary Judgment, shall be granted as to all claims.   A separate Order follows.

                           /s/

PETER J. MESSITTE

UNITED STATES DISTRICT JUDGE

February 22, 2012